# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

HERMAN M. GORDON, on behalf of himself and all others similarly situated,

          Plaintiff,

    vs.

SPORTSLINE.COM INCORPORATED, KENNETH W. SANDERS and MICHAEL LEVY,

          Defendants.

**03 - 61849**

**CIV-MIDDLEBROOKS**

**MAGISTRATE JUDGE JOHNSON**

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff and plaintiff's counsel, based upon the investigation undertaken by plaintiff's counsel (which investigation included analysis of publicly-available news articles and reports, public filings, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company) and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class (the "Class") consisting of all persons other than defendants who purchased the securities of Sportsline.com Incorporated ("Sportsline" or the "Company") between May 15, 2001 and September 25, 2003 seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

- 1 -



2.    Sportsline is an internet sports company and publisher of CBS Sportsline.com. Throughout the Class Period, defendants issued a series of false statements touting the Company's ability to leverage its resources and relationships with past and present e-commerce suppliers and develop additional revenue opportunities from its advertising base and fantasy sports business. At the beginning of the Class period defendants told the market that its operating results exceeded Wall Street expectations; that its advertising and marketing services business was maintaining profitability despite a challenging environment; that the Company was showing dramatic growth in all of its key audience metrics. The Company failed to disclose material information in its press releases and Form 10-Q's and 10-K's relating to: (i) the Company's inability to generate promised revenue from its advertising base and joint sales efforts with CBS; (ii) the increased competition in the fantasy sports market; and (iii) the lack of profitability of the MVP.com store.

3.    Throughout the Class Period, defendants publicized Sportsline's (i) expanding advertising base and its ability to mitigate overall diminished media spending; (ii) long-stated goal of reaching positive EBITDA in the fourth quarter of 2002; (iii) strategic relationship with CBS; (iv) successful integration of its fantasy products and their positive impact on the Company's overall growth and presence in the Internet sports media industry; and (iv) consumer demand for its services and client commitment to it products.

4.    However, defendants knew and failed to disclose that: (1) due to increased competition, the viability of the Company's fantasy sports business was not as significant a revenue source as they portrayed it to be; (2) revenue derived from advertising sales was diminishing and CBS was contributing significantly less advertising revenue than the Company

- 2 -

led investors to believe; (3) a positive EBITDA could only be achieved by hiding expenses and improperly classifying discontinued operations; and (4) that MVP.com's assets did not yield promised value. Belatedly, defendants disclosed that due to accounting errors in the way it expensed employee stock options, a reclassification of its discontinued operations, a reduction in value of its e-commerce operations acquired from MVP.com, and slower than expected recovery in online advertising, Sportsline's earnings were negatively impacted and that the Company will be reporting losses.

5. Defendants failed to disclose the magnitude of the above-mentioned problems in order to artificially inflate the Company's stock. The Company's stock price was crucial because it was necessary to fulfill Sportsline's 2003 obligation of $20 million to CBS[1] and to purchase Sandbox.com[2].

6. As a result of the Company's misrepresentations, Sportsline investors have sustained tremendous losses and stand to lose much more as the Company's financial condition continues to decline. On September 26, 2003, Sportsline shocked the market by revealing that the Company is reducing its previous optimistic revenue and earnings forecasts for the third

---

[1]    CBS and Sportsline entered into an agreement whereby CBS receives the Company's common stock in exchange for licenses of CBS trademarks, advertising and promotional consideration and sales opportunities. The agreement with CBS requires Sportsline, among other obligations, to issue to CBS $20 million worth of its common stock on each of April 1, 2003, July 1, 2004, October 1, 2005 and January 1, 2007. The number of shares that Sportsline issued to CBS on April 1, 2003 was limited to a number of shares that would not increase Viacom's beneficial ownership of Sportsline 's outstanding shares above 39.9% while maintaining the aggregate payment amounts over the term of the agreement. On April 2, 2003, Sportsline announced that 5,454,428 shares of its common stock were issued to CBS Broadcasting Inc., a unit of Viacom Inc. The shares issued to CBS were valued at $5,399,884 and the remainder of the Company's 2003 obligation of $20 million was deferred until July 1, 2004. This issuance was based on Viacom's current ownership level and the number of shares of Sportsline common stock currently outstanding. *Therefore, is it apparent that the higher the value of Sportsline's stock, the greater the amount of the obligation the Company could pay.*

[2]    Although the agreement with Sandbox was eventually terminated due to Sandbox's breach of certain representations and covenants in the acquisition agreement, Sportsline used its stock as payment for the acquisition.

quarter and full year 2003 and that it is *restating its reported financial results for the past two and a half years*.

7.      In response to the Company's devastating news concerning the accounting errors, the reduction in value in its e-commerce operations, increased fantasy competition, and slower than expected recovery from online advertising, Sportsline's stock price plummeted by more than 30%, or by $0.54 to $1.22, on volumes of about eight times the daily average .

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act (15 U.S.C §§ 78j(b) and 78t(a) and rule 10b-5 promulgated thereunder (17 C.F.R. § 240. 10b-5). The acts and conduct complained of herein, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District, and Sportsline maintains its principal place of business in this District.  In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ National Market (the "NASDAQ"), a national securities exchange.

## PARTIES

11.    Plaintiff purchased securities, as set forth in the certification attached hereto and incorporated herein by reference.

12.    Defendant Sportsline is a Florida corporation and maintains its principal executive offices at 2200 West Cypress Creek Road, Fort Lauderdale, Florida, 33309.  According to a recent press release:

> Sportsline is the number one online sports brand available for licensing in the market today, providing Internet sports content, community and e-commerce. As the publisher of CBS SportsLine.com the official Web sites of the NFL, PGA Tour and NCAA Sports, as well as the exclusive (together with Sports Illustrated) provider of sports news, statistics, major event coverage and fantasy games to more than 35 million AOL members, Sportsline serves as one of the most comprehensive sports information sources, containing an unmatched breadth and depth of multimedia sports news, information, entertainment and merchandise.

13.    The individuals named as defendants herein (the "Individual Defendants") served in the capacities listed below and received substantial compensation:

| Name | Position |
|------|----------|
| Michael Levy | President, CEO, and Chairman of the Board of Directors |
| Kenneth W. Sanders | President of Finance and Administration and CFO |

14.    By reason of their management positions, and/or membership on Sportsline's Board of Directors, and their ability to make public statements in the name of Sportsline, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Sportsline to engage in the unlawful conduct complained of herein.

## MOTIVE, OPPORTUNITY AND KNOWLEDGE

15.     Because of their Board memberships and/or executive and managerial positions with Sportsline, each of the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of Sportsline particularized herein via access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

16.     Defendants had a duty to disseminate accurate and truthful information with respect to Sportsline's operations and financial condition promptly or to cause and direct that such information be disseminated and to correct promptly any previously disseminated information that was misleading to the market.  As a result of their failure to do so, the price of Sportsline securities was artificially inflated during the Class Period, damaging plaintiff and the Class.

17.     The Individual Defendants, because of their positions with Sportsline, controlled the contents of the quarterly and annual reports, press releases and presentations to securities analysts.  Each Individual Defendant was provided with copies of the reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then

- 6 -

false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Sportsline's corporate releases detailed herein as "group-published" information and is therefore responsible and liable for the representations contained therein.

18.    Each of the defendants is liable as a primary violator in making false and misleading statements, and/or for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sportsline securities during the Class Period.  All of the defendants had motives to pursue a fraudulent scheme in furtherance of their common goal, i.e., inflating the profits of Sportsline and the trading price of Sportsline securities by making false and misleading statements and concealing material adverse information.  The fraudulent scheme and course of business was designed to and did:  (i) deceive the investing public, including plaintiff and other Class members; (ii) artificially inflate the price of Sportsline stock during the Class Period; (iii) cause plaintiff and other members of the Class to purchase Sportsline stock at inflated prices; and (iv) conceal and cover up the true financial condition of Sportsline.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and all purchasers of Sportsline securities from May 15, 2001 through September 25, 2003.  Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal

- 7 -

representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  Sportsline had over 44.0 million shares outstanding as of September 26, 2003. The precise number of Class members is unknown to plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Sportsline or its transfer agent or the underwriters to the Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

21.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

22.     Plaintiff's claims are typical of the claims of the other members of the Class because plaintiff's and all the class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

23.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no

difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a.      Whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      Whether the prospectuses and registration statement issued by defendants to the investing public in connection with the Offering and defendants' other public statements during the Class Period omitted and/or misrepresented material facts about Sportsline and its business; and

c.      The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

**A.      Background**

25.     According to its own description in its press release:

Sportsline is the leading edge of media companies providing Internet sports content, community and e-commerce. As the publisher of CBS SportsLine.com and the official Web sites of the NFL and the PGA TOUR, the Company serves as one of the most comprehensive sports information sources available, containing an unmatched breadth and depth of multimedia sports news, information, entertainment and merchandise. Sportsline also has strategic relationships with Major League Baseball and the NBA, and serves as a primary sports content provider for America Online. In 1999, the Company commenced operations in Europe through Sports.com Limited, Europe's leading Internet and mobile data provider of sports content.

**B.      MVP.com**

26.      On May 15, 2001, Dan Head, vice president of e-commerce for the Company,

issued a press release detailing the value of MVP.com.  Specifically, the press release stated:

> "We've proven our ability to convert our large audience of CBS SportsLine.com
> users into shoppers, by providing contextual merchandise links throughout the
> content on our award-winning site.  When you combine that success with the
> promotional leverage of USA Networks' impressive group of Internet businesses
> and ECS' state-of-the-art technology, we've got a powerful blend of assets to
> enable us to rapidly grow the MVP.com store."

                                    *   *   *

> "Revenue from transactions will inevitably grow into a larger piece of the total
> entertainment pie, both online and off, and we believe the new MVP.com site
> combines all the right features -- easy navigation, compelling content, expansive
> product selection, reliable customer services, and integrated marketing -- to give it
> broad appeal and real profit potential, the only way we know of doing transactions
> on the Internet."

27.      And in a September 22, 2003 press release, Head further commented:

> "We were able to leverage our resources and relationships with past and present
> e-commerce suppliers to limit exposure from an inventory standpoint, as well as
> minimize incremental expense and personnel."

28.      In fact, as detailed below, the Company misrepresented its e-commerce supplier's

ability to provide value to the Company and increase its revenues, resulting in increased

expenses, decreased profits, and other material charges.

**C.      Fantasy Subscription Business and Advertising Sales**

29.      On July 6, 2001, Sportsline revised its forecast for the quarter ended June 30,

2001.  Commenting on the revision, defendant Levy stated:

> "Our revised expectations are a result of a challenging business environment, in
> particular the domestic advertising market, coupled with the normal seasonality in
> our business."

- 10 -

30.    However, within five days of the revision, the Company issued a press release touting its multi-year agreement with The National Football League, CBS, a unit of Viacom, and America Online:

> "It is gratifying that the NFL, AOL and CBS have once again acknowledged Sportsline's proven ability to successfully deliver on all fronts production, promotion and sales in particular - and we are proud to be a major part of this industry shaping deal."

* * *

> "We are excited to once again extend and expand our strategic relationship with America Online," said Andrew Sturner, president, corporate and business development for Sportsline. "Through the extension of our existing relationship with America Online and our NFL alliance, also announced today, *Sportsline has expanded two major relationships that will serve as a catalyst for our future growth.*"

31.    Then, on October 3, 2001, defendant Levy added:

> "SportsLine.com is showing dramatic growth in all of its key audience metrics resulting from our *best of breed fantasy products,* our new relationship with the NFL and the promotion we receive from our long-time partners at CBS Sports and AOL. This growth in our targeted and demographically attractive audience as we move into October, the busiest sports month of the year featuring football, the baseball post-season and the beginnings of hockey and basketball, provides *excellent opportunities for advertisers* with Sportsline.com and our network of sites."

32.    On July 24, 2001, defendants reported second quarter 2001 results. The earnings release stated:

> Management expects domestic revenue for the full year 2001 to be approximately $60 million, with *advertising anticipated to account for approximately 85% of the domestic revenue base for the year.* In the third quarter of 2001, Sportsline expects domestic revenue to be between $12 and $13 million. The Company anticipates gross margins to range between approximately 50 and 60% during the second half of 2001.

33.    Commenting on the Company's business outlook, defendant Levy stated:

"We are clearly poised with a huge market opportunity, a strong brand and *great strategic partners.* With our concentration on developing new revenue initiatives, preservation of capital and prudent spending, *we feel very good about our prospects as a viable sports media business despite the continued slowdown in advertising spending."*

34.    On September 19, 2001, defendants issued a press release reporting the record number of single day traffic hits on its website.  Defendant Levy stated:

"These record-breaking numbers and our very targeted and attractive demographics provide *outstanding opportunities for advertisers* with Sportsline and our network of sites.  Our new relationship with the NFL, the promotion we receive from our long-time partners at CBS Sports and AOL, and our *increased emphasis on developing more and better fantasy products are clearly paying dividends."*

35.    A far cry from the revised estimates of July 6, 2001, on October 23, 2001, the Company released its 3Q 2001 earnings.  The earnings release stated:

*Financial results for the quarter exceeded the most recent expectations of Wall Street analysts,* while audience metrics established records in traffic, reach and time spent per user.

\* \* \*

Sportsline generated $12.0 million in domestic advertising revenue during the third quarter, which represents a 44% sequential increase over second quarter domestic advertising revenue and a slight increase over pro forma domestic advertising revenue of $11.6 million in the third quarter 2000.

\* \* \*

In the fourth quarter of 2001, the Company expects revenue to be between $14 and $15 million, approximately 90% of which is expected to be advertising revenue.

\* \* \*

*The Company estimates the 2002 revenue base will grow by approximately 20 to 30 percent over 2001.*

- 12 -

36.     Commenting on this earnings release, defendant Levy stated:

"The results for the quarter are evidence of the strength of our service and product offering.  Our operating results exceeded Wall Street expectations, *we were able to generate both year-over-year and sequential growth in advertising revenue*, and we exhibited record-setting traffic and reach.  There is a clear opportunity for Sportsline to leverage its strong brand and great strategic partners in order to maximize its growth potential, and continue on its path to cash flow break-even."

37.     And in a November 15, 2001 and January 28, 2002 press release, respectively, defendant Levy stated:

"We are extremely encouraged as *we continue to gain traction from* our NFL and AOL deals, our *CBS promotion and fantasy football*. The combination of our strong reach, targeted demographic, user loyalty and the creativity of our sales group allows Sportsline to provide advertisers with an outstanding opportunity to market their products and brands."

*   *   *

"We are extremely pleased that Sportsline is once again recognized by our peers for not only producing the best sports Web sites, but also for our ability to forge extremely valuable partnerships with other industry leaders."

38.     On January 29, 2002, the Company released its 3Q 2001 earnings.  The earnings release stated:

Financial results for the quarter exceeded the most recent expectations of Wall Street analysts, while audience metrics established records in traffic and reach.

*   *   *

*Sportsline advertising revenue increased both sequentially and year-over-year* to $13.7 million in the fourth quarter of 2001, compared with $12.0 million in the third quarter of 2001, and pro forma advertising revenue of $13.1 million in the fourth quarter of 2000.

*   *   *

Management expects total revenue for the full year 2002 to be in the range of $68 to $72 million, which would represent a growth rate of approximately 20-25% over 2001 pro forma revenue.

- 13 -

\* \* \*

***The Company anticipates that approximately 85% to 90% of total revenue in
2002 will come from advertising and marketing services.***

39.     Defendant Levy added:

"It is clear from our strong performance in the final quarter of 2001 that
Sportsline successfully navigated through a very challenging year, and ***has strong
momentum heading into 2002.*** Our operating results for the quarter again
demonstrate that despite overall diminished media spending, our clients remain
committed to our products and we remain committed to prudently managing the
business toward positive cash flow."

40.     On February 26, 2002, the Company commented on its relationship with CBS.

The press release stated:

Unlike most of the dot coms, we continue to flourish for a couple of reasons: we
have always concentrated our ad sales efforts on the traditional television sports
sponsors instead of other dot coms, and we preserved our cash by ***utilizing
strategic relationships with CBS***, AOL and Westwood One Radio and many
others to promote our site rather than expensive television ad provided the
funding necessary to get started.

41.     On April 29, 2002, the Company released its 1Q 2002 earnings.  The earnings

release stated:

Sportsline advertising revenue was $14.6 million for the first quarter 2002, a 7%
increase over the $13.7 million recorded in the fourth quarter of 2001.

\* \* \*

The conversion of the fantasy baseball league management product back to a fee-
based product has resulted in approximately $1.5 million in billings, which will be
recorded as revenue primarily in the second and third quarters. Approximately
12,000 paid leagues have been formed, more than twice as many paid leagues as
in 2000, the most recent year for previous pay fantasy baseball products. In
addition, approximately 8,000 fantasy baseball teams have been formed for our
other premium pay products. ***Based on the positive results from fantasy baseball
sign-ups, the Company anticipates fantasy football revenue in the second half
of the year to be at least two to three times greater than fantasy baseball
revenue.***

- 14 -

*   *   *

Also consistent with previous guidance, the Company expects to reach positive EBITDA in the fourth quarter of 2002.

42.     On July 25, 2002, the Company released its 2Q 2002 earnings.  The earnings release stated:

> *Sportsline launched its fee-based fantasy football products earlier this month, with the anticipation that revenue would be at least two to three times greater than fantasy baseball revenue. In less than three weeks, the sales trends have been very positive, as fantasy football revenue is already roughly the same as what the Company billed for the entire fantasy baseball season.*
>
> *   *   *
>
> Domestic advertising and marketing services revenue increased 11%, to $ 9.4 million in the second quarter of 2002 compared to $ 8.5 million in the same quarter of 2001.
>
> *   *   *
>
> Consistent with previous guidance, the Company expects to achieve positive EBITDA in the fourth quarter of 2002.
>
> *   *   *
>
> The Company anticipates that approximately 80 to 85% of total revenue in 2002 will come from advertising and marketing services.

43.     Defendant Levy added:

"We're feeling very good about our business as we head into the strongest time of the year for our company.  I am pleased that *we were able to exceed domestic advertising revenue in this quarter* compared to a year ago, unlike many other media companies who are struggling to show any growth at all. Our subscription and premium products revenue has gained traction with our fee-based fantasy football ramping up nicely, our direct marketing initiatives are continuing to grow, *the advertising marketplace is showing positive signs* and the sports calendar is coming to its busiest time of the year."

- 15 -

44.     On October 22, 2002, the Company released its 3Q 2002 earnings.  The earnings

release stated:

> Sportsline reported an increase in cash and marketable securities of $7.6 million, primarily resulting from the advance collection of fantasy and certain advertising revenue.
>
> *   *   *
>
> Revenue for the third quarter of 2002 was $15.5 million, an increase of 14% compared to $13.6 million in the same quarter of 2001, and a sequential increase of 41% compared to $11.0 million in the second quarter of 2002.
>
> *   *   *
>
> The success of the Company's fee-based fantasy football strategy contributed to the rise in subscription and premium products revenue to $3.7 million in the third quarter 2002, a 185% increase compared to $1.3 million in the same period a year ago and a 131% sequential increase compared to $1.6 million in the second quarter of 2002.
>
> *   *   *
>
> ***Advertising and marketing services revenue increased 25% sequentially*** compared to the second quarter of 2002.
>
> *   *   *
>
> Revenue for the third quarter of 2002 was $15.5 million, compared to the $13.6 million recorded in the same quarter of 2001, an increase of 14%. Compared to second quarter 2002 revenue of $11.0 million, the sequential increase is 41%.
>
> *   *   *
>
> The preliminary outlook for 2003, which is subject to change, currently calls for revenue growth in the 15% range for the full year.
>
> *   *   *
>
> The Company anticipates the total revenue base in 2003 to be split approximately 75% advertising and marketing services and 25% subscription and premium products, with subscription and premium products revenue expected to grow more than 30% over 2002.

45.    Defendant Levy commented:

"This quarter is indicative of the strength of Sportsline's business as we made significant strides in the right direction in all of our major financial metrics: net loss, EBITDA and revenue.  We have put Sportsline in position to achieve our long-stated goal of reaching positive EBITDA in the fourth quarter. We continue to efficiently manage the expense side of our business while on the revenue side, *our advertising and marketing services business is more than holding its own in a challenging environment. Furthermore, we have successfully proven the viability of our fantasy sports business as a significant revenue source, as we have already generated in excess of $10 million year-to-date from fantasy sports.*"

46.    On January 30, 2003, the Company released its 4Q 2002 earnings.  The earnings release stated:

The Company estimates that total revenue for the full year 2003 will be in the $68-$72 million range, representing a growth rate of approximately 10-15% over reported revenue in 2002.

\* \* \*

For the first quarter of 2003, the Company expects total revenue in the $12 to $13 million range, with approximately 90% of first quarter revenue to come from advertising and marketing services.

47.    Defendant Levy added:

"Eighteen months ago, we established the goal of achieving positive EBITDA for the first time in this final quarter of 2002, then we proceeded to execute our plan. This achievement is the strongest indication yet of both the viability of Sportsline's business model and our ability to execute on it.  We made dramatic progress this past year in diversifying our revenue, while continuing to manage our costs effectively.  These results clearly demonstrate that Sportsline is squarely positioned as a leader for years to come in the Internet media and services industry."

48.    On April 24, 2003, the Company released its 1Q 2003 earnings.  The earnings release stated:

The quality of the Company's advertising revenue base continues to develop, as more than 40% of advertising revenue for the first quarter of 2003 came from Fortune 500 clients.

* * *

Revenue generated through joint sales efforts with CBS represented approximately 18% of the Company's total advertising sales in the quarter ended March 31, 2003, compared to 7% in the same quarter a year ago.

* * *

More than 75% of the Company's sales target for the second quarter of 2003 has been met.  These favorable back-log results have allowed the Company's sales team to begin focusing efforts on events of the second half of the year, including the NFL season, earlier than in previous years.

* * *

In the first quarter of 2003, the Company generated $2.3 million in fantasy baseball billings, which will be recognized as revenue primarily in the second and third quarters of 2003.  ***This represents a 53% increase over the $1.5 million in total fantasy baseball revenue in 2002.***

* * *

The Company expects approximately 80-85% of second quarter 2003 revenue from continuing operations to come from advertising and marketing services. The Company anticipates that for the full year 2003, approximately 70-75% of total revenue from continuing operations will be from advertising and marketing services, and 25-30% is expected from subscriptions and premium products, with seasonal fluctuations anticipated from quarter to quarter.

49.     Defendant Levy commented:

"We made considerable progress toward our goal of achieving positive cash flow for the full year.  The significant year-over-year improvements we made this quarter are the result of our focus on both the core media and subscription businesses and the ability of management to continue to execute on our plan."

50.     On July 17, 2003, defendant Levy further stated:

- 18 -

"Working together with the NFL to offer a selection of our fee-based fantasy football products directly to NFL.com users will enable *Sportsline to grow our fantasy business faster and more effectively*.  We've enjoyed a great relationship with the NFL and are looking forward to expanding it with this new agreement. *This provides us with another catalyst to ensure we reach our targets both in terms of subscribers and revenue produced.*"

51.    On July 24, 2003, the Company released its 2Q 2003 earnings.  The earnings release stated:

Advertising trends for the second half of the year are positive as approximately 60% of the Company's sales target for the third quarter and nearly 50% of the fourth quarter target already have been met, consistent with expectations.

\* \* \*

The Company generated $2.6 million in fantasy baseball billings this year, which is being recognized as revenue in the second and third quarters of 2003. *This represents a 68% increase over the $1.5 million in total fantasy baseball revenue in 2002.*

\* \* \*

More than 18,000 paid fantasy baseball leagues were sold this ear, approximately 40% greater than the approximately 13,000 sold last year.   The number of paid teams has increased from approximately 150,000 in 2002 to approximately 240,000 teams in 2003, representing a 60% increase.

\* \* \*

The Company expects approximately 70-75% of both third quarter and full year 2003 revenue to come from advertising and marketing services, and 25-30% from subscriptions and premium products, with seasonal fluctuations anticipated from quarter to quarter.

52.    Defendant Levy added:

"Sportsline again experienced steady growth in all areas this quarter, continuing on our course to achieve positive cash flow in the second half of the year.  We're seeing very positive trends both in our fantasy subscription business and in advertising sales as we head into what is traditionally the strongest time of the year for our company. We are also excited about some recently developed

- 19 -

additional fantasy revenue opportunities, including our expanded NFL agreement."

53.    Defendants' statements touting the Company's : (i) expanding advertising base and its ability to mitigate overall diminished media spending; (ii) long-stated goal of reaching positive EBITDA in the fourth quarter of 2002; (iii) strategic relationship with CBS; (iv) successful integration of its fantasy products and their positive impact on the Company's overall growth and presence in the Internet sports media industry; and (iv) consumer demand for its services and client commitment to it products were all false and misleading.

54.    The statements from the press releases and quarterly reports detailed above were each materially false and misleading when issued as they misrepresented and/or omitted the following adverse facts which then existed, the disclosure of which was necessary to make the statements made not false and misleading, including: (i) the Company's inability to generate revenue from its advertising base and joint sales efforts with CBS; (ii) the Company's outlook on its fantasy sports business and overall competition in the fantasy sports market; and (iii) the lack of profitability of the MVP.com store.

55.    Defendants were aware of the foregoing because they closely monitored the Company's advertising business, revenue and pipeline visibility with the Gomez Performance Network[3] and Solbright's AdSuite[4].

_____

[3]    Gomez, Inc. delivers web site performance monitoring services to Sportsline. "We chose Gomez Performance Network due to its greater ease of use, additional functionality and greater value for our investment," stated Dan Leichtenschlag, president of operations, CTO of Sportsline. "Gomez provides tools that allow us to continuously monitor and measure our performance, which helps Sportsline ensure its users have the best experience on the Web."

[4]    Sportsline received, from Solbright, an advertising management system that is fully integrated to provide complete management of the advertising sales, trafficking, billing, delivery and reporting processes.  Solbright's AdSuite also delivers detailed management and revenue reporting which helps executive staff to better understand

- 20 -

56.     Item 303(a)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

57.     Paragraph three of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (a) matters that would have an impact on future operations and have not had an impact in the past . . .

58.     Notwithstanding these requirements, at no time during the Class Period did the defendants fully discuss its slow recovery in online advertising, the decrease in value of its e-commerce operations, the disappointing ad revenue from joint sales efforts with CBS, or the more-competitive fantasy sports market, in the Company's public filings with the SEC, as required by the preceding SEC Regulation.

## E.     The Truth Emerges

59.     On September 26, 2003, defendants issued a press release announcing that the

---

sales pipelines, customer contracts, and revenue recognition and allocation.  According to Mark Mariani, president of sales and marketing for Sportsline,  "We selected Solbright to enhance our order management system because it has the ability to handle the intricacies of our advertising business while providing executive management with revenue reporting and pipeline visibility."

Company would have to restate financial results for 2001, 2002 and a portion of 2003.

According to a press release issued prior to the market opening on September 26, 2003,

defendants stated:

> The change will increase net loss for 2001 by approximately $5.0 million from $61.1 million to approximately $66.1 million, for 2002 by approximately $2.3 million from $48.2 million to approximately $50.5 million, and for the first six months of 2003 by approximately $700,000 from $22.2 million to approximately $22.9 million.

60.    The Company also revealed that the re-audit may reveal additional accounting

adjustments, stating:

> The Company will file reports reflecting the changes as soon as the re-audit of 2001 is completed, which the Company anticipates will be no later than November 15, 2003. The Company does not anticipate the restated consolidated statements will include any other adjustments. *However, such additional adjustments are possible as a result of the re-audit of 2001 by Ernst & Young.*

61.    Finally, defendants revealed that the Company's business outlook going forward

was much worse than the market had been previously assured.  The press release stated:

> The Company also updated its business outlook for the third quarter and remainder of 2003. While the Company is still anticipating double-digit revenue growth for the full year 2003 from continuing operations and positive cash flow for the fourth quarter, revenue for the third quarter 2003 is now expected to be approximately 5% below the lower end of the range previously provided of $16.0-17.0 million. For the full year 2003, the Company expects revenue to be approximately 5-10% less than the lower end of the range previously provided of $64.0-66.0 million. The Company attributes the reduction in revenue expectations to a combination of increased competition in the fantasy sports subscription market and a slower than expected recovery of the online advertising market. In addition, the Company's previous outlook anticipated that joint sales efforts with CBS would contribute significantly more advertising revenue than is currently anticipated for the third and fourth quarters of 2003. Also, the Company expects to record a one-time charge in the third quarter 2003 of $2.8 million to reflect the reduction in the estimated value of the e-commerce assets it acquired from MVP.com, Inc. in January 2001.

The Company is now projecting an EBITDA loss from continuing operations (net loss excluding interest and other expense, depreciation and amortization, amortization of equity issued to third parties, stock compensation expense, loss on the sale of discontinued operations and write-down of e-commerce assets) for the third quarter 2003 of between $1.5 and $2.5 million, and an EBITDA loss from continuing operations for the full year 2003 to be between $2.5 and $4.0 million. This expectation compares with the 2002 EBITDA loss from continuing operations of $14.5 million. The following table reconciles the Company's EBITDA outlook for the third quarter and full year 2003 to its anticipated net loss during these periods.

## SCIENTER ALLEGATIONS

62.      As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Sportsline and its business practices, their control over and/or receipt of Sportsline's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sportsline, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

63.     The Individual Defendants engaged in such a scheme to inflate the price of Sportsline securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of Sportsline securities; and (iii) allow the Company to complete lucrative deals with other companies.  The Individual Defendants' scienter is evidenced by the fact that: (i) Dan Leichtenschlag, president of operations/chief technology officer and Andrew Sturner, president of corporate and business development were replaced (they either left the company or were moved to new positions) at the same time the Company's financial difficulties were occurring.  Sturner abruptly resigned on the *very same day that the Company announced its 2Q 2002 earnings* and Leichtenschlag resigned *two weeks before the Company released its 1Q 2002 earnings*.  Although this change, taken alone, might not support scienter, the fact that two different division presidents resigned moved is highly suspicious, especially when coupled with the additional allegations in the Complaint; and (ii) the fact that defendant Levy purchased large blocks of stock right before the Company was due to pay its obligation to Viacom.[5]

## STATUTORY SAFE HARBOR

64.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.  Nor was it stated that actual results "could differ materially from those projected."  Nor were the forward-looking

---

[5] The timing of the purchases are unusual in both timing and amount.  Defendant Levy purchased blocks of stock throughout the entire month of March 2003, beginning on March 7, 2003 and ending on March 31, 2003.  The last time defendant Levy purchased any stock was on August 10, 2001.

statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Sportsline who knew that those statements were false when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

65.     At all relevant times, the market for Sportsline stock was an efficient market for the following reasons, among others:

(a)     Sportsline stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient market;

(b)     As a regulated issuer, Sportsline filed periodic public reports with the SEC and the NASD;

(c)     Sportsline stock was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)     Sportsline regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

66.     As a result, the market for Sportsline securities promptly digested current information with respect to Sportsline from all publicly-available sources and reflected such information in Sportsline's stock price.  Under these circumstances, all purchasers of Sportsline

securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

### COUNT I
**For Violations Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated hereunder**
**Against Defendants Sportsline, Levy and Sanders**

67.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

68.     During the Class Period, Sportsline, Levy and Sanders carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sportsline securities; and (iii) cause plaintiff and other members of the Class to purchase Sportsline stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants Sportsline, Levy and Sanders took the actions set forth herein.

69.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Sportsline securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  Defendants Sportsline, Levy and Sanders are also sued herein as controlling persons of Sportsline, as alleged below.

- 26 -

70.     In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

71.     Sportsline and these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Sportsline as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sportsline's value and performance and substantial growth.  This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Sportsline and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of Sportsline securities during the Class Period.

72.    Defendants Sportsline, Levy and Sanders' primary liability, and controlling person liability, arises from the following facts: (i) each of the defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) these defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) these defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

73.    Defendants Sportsline, Levy and Sanders had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Sportsline's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, these Defendants, if they did not have actual knowledge of the

- 28 -

misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sportsline's securities was artificially inflated during the Class Period. Unaware of the fact that the market price of Sportsline's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, plaintiff and the other members of the Class acquired Sportsline securities during the Class Period at artificially high prices and were damaged thereby.

75.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were unaware of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Sportsline, which were not disclosed by these defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Sportsline securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76.     By virtue of the foregoing, these defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**For Violations Of Section 20(a) Of The**
**Exchange Act Against Defendants Levy and Sanders**

78.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

79.     Defendants Levy and Sanders were and acted as controlling persons of Sportsline within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Each of these Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In addition, each of the Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81.     As set forth above, Sportsline and these Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, Defendants Levy and Sanders are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## BASIS OF ALLEGATIONS

82.     This complaint is pleaded in conformance with the Federal Rules of Civil Procedure and the PSLRA.  Plaintiff has alleged the foregoing based upon the investigation of plaintiff's counsel, which included, inter alia, a review of Sportsline's SEC filings, securities analysts' reports and advisories about the Company, press releases issued by the Company and media reports about the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

a.     declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

b.     awarding plaintiff and other members of the Class damages together with interest thereon; awarding plaintiff and the Class rescission on Count II to the extent they still hold Sportsline shares, or if sold, awarding rescissory damages in accordance with Section 12(a)(2) of the Securities Act;

c.     awarding plaintiff and other members of the Class their costs and expenses of this

litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

d.   awarding plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2003

Respectfully submitted,

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**

By: _____
Maya Saxena
msaxena@milberg.com
Heather Siegel
hsiegel@milberg.com
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400
                    -and-
Steven G. Schulman
Andrei Rado
One Penn Plaza, 49th Floor
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229

**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA  19004
Tel: (610) 660-8000
Fax: (610) 660-8080

**Attorneys for Plaintiff**

- 32 -

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

HERMAN M. GORDON (" plaintiff ") declares, as to the
claims asserted under the Federal Securities Laws, that:

1.   Plaintiff has reviewed the complaint prepared by counsel
and is willing to serve as a lead or named plaintiff in the
Action on the basis of the allegations in that complaint or a
substantively similar complaint or amended complaint to be filed.
Plaintiff retains the Law Offices of Marc S. Henzel and such co-
counsel it deems appropriate to associate with to pursue such
action on a contingent fee basis.

2.   Plaintiff did not purchase the Security that is the
subject of the complaint at the direction of plaintiff's counsel
or in order to participate in any private action arising under
the Federal Securities Laws.

3.   Plaintiff is willing to serve as a lead or
representative party, either individually or as part of a group
on behalf of a class, including providing testimony at deposition
and trial, if necessary.

4.   Plaintiff has made the following transactions during the
Class Period in the stock of SportsLine.com, Inc. (NASDAQ: SPLN)
that are subject of this action:

| DATE | BUY OR SALE | AMOUNT OF SHARES | PRICE PER SHARE |
|------|-------------|------------------|-----------------|
| 9/23/03 | Buy | 500 | $ 7.00 |
| | | | |

5.   In the past three years, plaintiff has not sought to
serve as a representative party on behalf of a class.

6.   Plaintiff will not accept any payment for serving as a
representative party on behalf of a class beyond plaintiff's pro
rata share of any recovery, except such reasonable costs and
expenses (including lost wages) directly relating to the
representation of the Class as ordered or approved by the Court.

7.   I declare under penalty of perjury that the foregoing
Is true and correct.  Executed this  3   day of  OcT  2003.


Herman M. Gordon
Signature

IS 44
Rev. 12/96)

# CIVIL COVER SHEET   03 - 61849

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by
aw, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required fir the use by the
Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| HERMAN M. GORDON on behalf of himself and all others similarly situated | SPORTSLINE.COM INCORPORATED, KENNETH W. SANDERS and MICHAEL LEVY |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Nassau County (NY)**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Broward
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**CIV-MIDDLEBROO**

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Milberg Weiss Bershad Hynes & Lerach LLP
5355 Town Center Road, Suite 900
Boca Raton, FL 33485
Tel: 561-361-5000

ATTORNEYS (IF KNOWN)
Unknown

**MAGISTRATE JUDGE
JOHNSON**

(d) CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   PALM BEACH,   MARTIN, ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to distric Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | PERSONAL INJURY | A TORTS — PERSONAL INJURY | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | B ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | B ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |  |  | B ☐ 630 Liquor Laws |  | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | PERSONAL PROPERTY | B ☐ 640 R R & Truck |  | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | B ☐ 650 Airline Regs |  | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B ☐ 660 Occupational Safety/Health |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | B ☐ 690 Other |  | ☒ 850 Securities/Commodities/ Exchange |
| ☒ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability |  |  | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury |  |  |  | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  |  |  |  | ☐ 892 Economic Stabilization Act |
| | | | | | ☐ 893 Environmental Matters |
| | | | | | ☐ 894 Energy Allocation Act |
| | | | | | ☐ 895 Freedom of Information Act |

| A REAL PROPERTY | A CIVIL RIGHTS | PRISONER PETITIONS | A LABOR | B SOCIAL SECURITY | |
|---|---|---|---|---|---|
| ☐ 210 Land Condemnation | ☐ 441 Voting | B ☐ 510 Motions to Vacate HABEAS CORPUS | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| B ☐ 220 Foreclosure | ☐ 442 Employment | B ☐ 530 General | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | A ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions A OR B |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B ☐ 540 Mandamus & Other | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | |
| ☐ 290 All Other Real Property | | B ☐ 555 Prison Condition | A ☐ 791 Empl Ret Inc Security Act | FEDERAL TAX SUITS | |
| | | | | A ☐ 870 Taxes (U S Plaintiff or Defendant) | |
| | | A PROPERTY RIGHTS | | A ☐ 871 IRS – Third Party 26 USC 7609 | |
| | | ☐ 820 Copyrights | | | |
| | | ☐ 830 Patent | | | |
| | | ☐ 840 Trademark | | | |

## VI. CAUSE OF ACTION (CITE THE U S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 U.S.C. Section 78j(b) and 78t(a)

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):

IF ANY
JUDGE _____   DOCKET NUMBER _____

DATE
**October 7, 2003**

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____